IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : No. 23-CR-448 (JEB) |
| | : |
| COLBY PURKEL | : |

### SENTENCING MEMORANDUM

**I.   Introduction**

Colby Purkel respectfully submits this sentencing memorandum in anticipation of sentencing, which is scheduled to proceed on Thursday, August 1, 2024. As set forth below, the sentencing factors set forth in 18 U.S.C. § 3553(a), such as Mr. Purkel's personal circumstances – including a total lack of prior criminal history, lengthy employment history, and strong community support – the limited and non-violent nature of his individual offense conduct, as well as his whole-hearted remorse, support a probationary sentence in this matter. The advisory sentencing guidelines also recommend a sentence not involving incarceration: in Mr. Purkel's case, his range of 0 to 6 months reflects a U.S.S.G. § 5C1.1 (zero-point) adjustment and falls into Zone A. Therefore "a sentence other than a sentence of imprisonment… is generally appropriate." U.S.S.G. § 5C1.1 comment. (n.10); Presentence Report (hereinafter "PSR"), ¶ 84. In short, a probationary sentence is "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing. 18 U.S.C. § 3553(a).

## II.     Mr. Purkel's Personal Characteristics and Offense Conduct

Throughout his childhood, and starting at two years old, Colby Purkel was raised by a single father – Willard Purkel, Jr. – after his mother left them "to start another family." *See* PSR ¶ 53. His parents divorced following a lengthy custody battle, after which his father was granted full custody. His mother had gone back to North Carolina with Colby and after being awarded full custody, his father came to get him and bring him to Louisiana. As a result, Colby did not see his mother, stepfather, or stepsiblings very often and instead stayed close to his father as they moved throughout Southeast Louisiana for his father's work. *Id.* ¶ 56. His mother reports that Colby and his father may have struggled financially after they separated, trying to make ends meet for their small family. *Id.* ¶ 54. He and his father lived with his grandparents for a while as they got back on their feet.

Colby attended a few elementary and middle schools, and always excelled at math and English. Later, in high school, he excelled at drafting and design. As his family and friends explain it, he has always been "mechanically inclined." It is no surprise that he is a diesel mechanic now. Although he never got in trouble himself at school – and as his mother explains – was "nice and polite to everyone he met," Colby was often teased and bullied by his peers. He believes that he was teased because his mother was not around and because of his personality (reportedly because he likes to talk) and his physical appearance when he had buck teeth. *Id.* ¶ 62. He was also called "scar face" when he needed surgery following an attack by a dog. Occasionally, he was physically assaulted by his peers. Nevertheless, he got through

the bullying, put his head to the ground, and made the best of school. He participated in ROTC, band, and baseball, earning his high school diploma in 2015.

Colby would have liked to continue his education. He attended two semesters of college at Southeastern University but stopped because he and his father could not afford the tuition. He needed to start working. Thus, from approximately 2016, he has been working as an auto mechanic, first at a business in Mandeville, Louisiana, and later as a diesel technician for his father's company. He has worked for that company for the past seven years. He works long, arduous hours, and his clients appreciate his hard work and commitment.

As detailed in the attached letters of support, the relationship that Colby and his father have is extraordinarily close. They both work incredibly hard together, and obviously share a personal bond that is difficult to describe. One of their clients describe his relationship with his father as "like one I have never seen." Ex. F. They "work tirelessly together" and "[t]here is no job, task and no problem that they can't complete or overcome together." *Id*.

Although he is much closer to his father than his mother and stepfather, the latter remain staunch supporters of him. They both wrote letters of support, attached as Exhibits B and E, in which they explained that Colby was never in trouble growing up, and how confused they are with his current situation. They know that he is deeply regretful for his conduct and embarrassed by the felony conviction. They also describe him as exceedingly patriotic, and they are not concerned that he will find himself on the wrong side of the law again.

The same is true for all of the friends and family who stand by him – there is universal bafflement that he finds himself in this position – facing sentencing for a federal felony offense – but universal agreement that Colby has deep regret for his participation in the events of January 6, 2021 and that he will never be arrested again. After all, he had never been in trouble before, and has not been in trouble since.

As it relates to his offense conduct, it is important to note that Mr. Purkel did not engage in violent conduct *as an individual*. He did not personally push any officers, he did not yell, hold signs, or otherwise verbally instigate any crowd violence. He did not kick down any barricades (and picked one up that had been kicked down by others). Instead, he formed a part of the crowd that eventually pushed into the Rotunda.[1] But once inside for no more than a few minutes, Colby was ordered to leave by the Capitol police, and he did so without hesitation. He did not need to be "escorted" as described by the government in its Memorandum, Rec. Doc. 44 at 2. As the parties agreed in the Statement of Offense, he "left the Rotunda when instructed to do so by Capitol police." Rec. Doc. 34 at 4. He even helped others to do so by yelling "Hey, quiet up! The exit is that way" when the Capitol police were trying to get the crowd to quiet down inside the Rotunda. He and his father Willard Purkel Jr. peacefully left with their hands in the air.

Colby's youth at the time of the offense is a factor that supports a sentence of

---

[1] Forming a part of the crowd that pushed into the Rotunda is the reason Colby Purkel was not offered a misdemeanor plea agreement. But it is not a reason to incarcerate him when all of the other factors – including the sentencing guidelines and U.S. Probation's recommendation – weigh in favor of probation.

4

probation. At the time of the offense, Colby was 24 years old. He was surrounded by people who were older than him, including his father whom he has looked up to for his entire life. Colby's young age at the time of the offense is an important mitigating factor in this case because "youth matters in sentencing." *Jones v. Mississippi*, 593 U.S. 98 (2021). Young people are less culpable because their judgment and impulse control are not as developed as an older person, and young people have a far greater capacity for change. *See Graham v. Florida*, 560 U.S. 48, 68, 74 (2010) (explaining that youth have "lessened culpability" and greater "capacity to change.").

The Supreme Court has time and again recognized "the mitigating qualities of youth" to be considered at sentencing. *Miller v. Alabama*, 567 U.S. 460, 476 (2012) (holding that mandatory life without parole for juvenile offenders was unconstitutional in all cases) (internal quotation marks omitted); *see also Gall v. United States*, 552 U.S. 38, 58 (2007); ("[I]t was not unreasonable for the District Judge to view [21-year-old] Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future."). "'[Y]outh is more than a chronological fact.' It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.' And its 'signature qualities' are all 'transient.'" *Miller*, 567 U.S. at 476 (quoting *Eddings v. Oklahoma, 455 U.S. 104, 115 (1982) and Johnson, 509 U.S. at 368)*. The Supreme

Court noted that these conclusions rest "not only on common sense—on what 'any parent knows'—but on science and social science as well." *Id.* at 471.

Age twenty-four is still considered young for purposes of brain development and sentencing. "Recent studies on the development of the human brain conclude that the human brain development may not become complete until the age of twenty-five …." G*all*, 552 U.S. at 58 (quoting with approval lower court's sentencing determination). "The frontal lobes, homes to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." Johnson, et al., Adolescent Maturity and the Brain, J. Adolescent Health 2009;[2] *Miller*, 567 U.S. at 472 n.5 ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance.") (internal quotations and citations omitted).

Significantly, the Sentencing Commission recently set forth proposed amendments to the Guidelines to ensure that courts are giving appropriate consideration to the "recent brain development research" for youth when fashioning sentences. *See* U.S. Sent'g Comm'n, Proposed Amendments 2024 at 12.[3] According to the Commission, "[r]esearch has shown that brain development continues until the mid-20s on average, potentially contributing to impulsive actions and reward-seeking

---

[2] Available at http://www.ncbi.nlm.nih.gov/ pmc/articles/PMC2892678/.
[3] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20231221_rf-proposed.pdf.

6

behavior." *Id*. at 15 (internal citations omitted). As such, the Commission's proposed amendments include a change to § 5H1.1 to adopt language that specifically calls for courts to consider a downward departure "based on youth." *Id*. at 38. The Commission notes that when determining the extent of the downward departure, courts should consider "[s]cientific studies on brain development showing that psychosocial maturity, which involves impulse control, risk assessment, decision-making, and resistance to peer pressure, developed until the mid-20s." *Id*.

Besides his youthful age at the time of the offense, Colby Purkel's post-offense conduct supports a finding that imprisonment is not necessary to achieve the purposes set forth in 18 U.S.C. § 3553(a). Colby's age at the time of the offense fell at the outer limit (mid-twenties) of the range where youthful decision-making begins to mature. This means that not only was his brain still developing at the time of the offense (age 24), but that it has significantly matured by the time of sentencing (age 28). Indeed, in the three and a half years since January 2021, Colby has had no problems refraining from criminal conduct. As the letters of support universally indicated, Mr. Purkel is a hard-working, caring man who helps others, and has never used illegal substances. He is also committed to his longtime girlfriend with whom he has plans to marry. He has shown through his actions (including perfect compliance with pretrial supervision, as well as a lack of controversial social media presence), that this offense constituted an aberration from his otherwise law-abiding life.

Thus, in the months and years following January 6, 2021, although he had videorecorded some of the events that day, he did not post those videos on social

7

media. Nor did he boast or suggest that he was proud of what occurred or his conduct. Following his arrest, and through his plea agreement, he fully accepted responsibility, agreeing to plead guilty to a felony conviction – giving him a criminal record when he previously had none – agreeing to pay $2,000 in restitution and allowing the government to search his social media, and waiving significant appellate rights.

### III. Further Sentencing Considerations

Although the extraordinarily harmful events on January 6, 2021 often warrant a sentence of incarceration, and the government always advocates for such a sentence, factors unique to Colby Purkel's case, even beyond his personal characteristics and individual offense conduct, weigh against it.

As an initial matter, in pleading guilty to a felony, Colby will experience significant consequences separate and apart from the sentence he faces. First, he now has a criminal record, which will impact his ability to obtain other jobs and potentially affect his ability to obtain financing should he try to buy a house or return to college. Second, he has already surrendered the firearms he previously (legally) owned and will not receive them back. Third, he may never be able to serve on a jury, first as a matter of Louisiana law and later as a matter of practice in jury selection. Finally, he will lose his right to vote, at least in this presidential election – a notable and fitting consequence for his offense. Thus, the consequences he is already experiencing are significant in their own right.

Second, a probationary sentence will allow him to pay full restitution. Colby

and his fiancée currently live with his father and have been attempting to save money to marry and one day move out on their own. Nevertheless, Colby has been setting aside money to pay restitution as well. He currently has $500 set aside to contribute towards restitution, and, if allowed to stay out of prison and continue his employment, he would be able to afford monthly restitution payments as ordered by the court.

Finally, and perhaps more importantly, the sentencing guidelines also support a probationary term. The PSR accurately calculates the guidelines as 0 to 6 months in prison, which could always be satisfied without incarceration because it falls within Zone A of the Sentencing Table. *See* U.S.S.G. § 5C1.1.(b) ("a sentence of imprisonment is not required"). However, since November 2023, the Sentencing Commission has made clear that not only is probation an *option*, it generally is *recommended* for individuals like Colby Purkel who receive the "zero-point" adjustment under § 4C1.1 and whose guidelines range falls into Zone A. U.S.S.G. § 5C1.1 comment. (n.10) ("a sentence other than a sentence of imprisonment… is generally appropriate") (citing 28 U.S.C. § 944(j)); PSR, ¶ 84. The zero-point adjustment applies, as the PSR indicates, because Mr. Purkel did not engage or violence or credible threats of violence.[4] *See United States v. Yang*, No. CR 23-100 (JDB), 2024 WL 519962 (D.D.C. Feb. 9, 2024) (making individual sentencing determination and applying adjustment despite personal physical conduct with Capitol police); *United States v. Hernandez*, No. CR 21-445 (CKK) (D.D.C. Jan. 31,

---

[4] The government did not object to the Draft PSR which indicated that the zero-point adjustment applies to Mr. Purkel's conduct. Nevertheless, its memorandum argues against its application. If a more fulsome response is necessary, undersigned counsel will be prepared to argue the issue at sentencing.

9

2024) (ECF No. 65) ("Hernandez Mem. Op.") (applying the adjustment where the defendant "took advantage of the violence of others."). As described *infra* at 4, Mr. Purkel did not engage in any violence as an individual, nor did he yell to encourage others to engage in violence, nor credibly threaten any violence.

The Commission proposed the zero-point adjustment amendment and commentary because it recognized that "offenders with zero criminal history points…have considerably lower recidivism rates than other offenders, including lower recidivism rates that the offenders in Criminal History Category I with one criminal history point."[5] For Colby Purkel, that data have proved correct – he has sustained no new arrests and poses an extremely low risk of future recidivism.

Because of his recommended guidelines range, Mr. Purkel's case is very different from the overwhelming majority of the other cases involving convictions for Civil Disorder 18 U.S.C. § 231. Table of Sentences Imposed in January 6 Cases, available at https://www.justice.gov/usao-dc/media/1331746/dl?inline. Most of the cases involve guidelines ranges that call for imprisonment. Even those cited by the government in its Memorandum involved higher ranges, either because the defendant personally "pushed [an] officer with his right arm," Government Sentencing Memorandum at 2, *United v. Hess*, CR-23-86 (RCL) (guidelines range of 8-14 months), or "jumped through a smashed-out window," remained in the Capitol for 17 minutes, and boasted about it afterwards on social media. Transcript of Sentencing Hearing at 27-28, *United States v. Daniel Johnson*, CR-21-407. Daniel

---

[5] Proposed Amendments to the Sentencing Guidelines, available at Reader-Friendly Proposed Amendments (ussc.gov) (Feb. 2, 2023) at 179.

Johnson also had a prior criminal record, and therefore his advisory range was 4 to 10 months in prison; he was sentenced to a bottom-of-the guidelines term of 4 months. *Id.* at 69. Finally, in drawing a comparison to Mr. Purkel's case, the government neglects to point out that defendant Ryan Yates "violently pushed against officers outside the Rotunda" and therefore his total offense level, involving a § 2BA2.4(b)(1)(A) enhancement for physical contact, was markedly higher – level 11. Government Sentencing Memorandum, *United States v. Yates*, CR-23-372 at 10. Because Yates had a prior criminal history point, he was ineligible for the zero-point adjustment, *id.* at 10-11, but was sentenced to 6 months in prison, two months below the advisory range of 8-14 months. Judgment, CR-23-372.

    For all of the reasons set forth above, as well as those contained in the attached letters of support and set forth in the Probation Office's sentencing recommendation, Colby Purkel respectfully requests a probationary sentence in this matter.

Respectfully submitted,

CLAUDE J. KELLY
Federal Public Defender

/s/ Annalisa Mirón
ANNALISA MIRÓN
Assistant Federal Public Defender
500 Poydras Street, Suite 318
New Orleans, Louisiana 70130
Telephone: (504) 589-7930
e-mail: annalisa_miron@fd.org